

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OHIO

## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N F O R M A T I O N |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:08 CR 441 |
| v. | ) | |
| | ) | |
| GENERAL ENVIRONMENTAL | ) | JUDGE ADAMS |
| MANAGEMENT, LLC, and | ) | |
| | ) | |
| SCOTT A. FORSTER, | ) | Title 18, United States Code Sections, |
| | ) | 1001, 1018, and 2 |
| Defendants. | ) | |
| | ) | |
| | ) | |

The United States Attorney charges:

## <u>COUNT 1</u>

1.    The United States Environmental Protection Agency ("U.S. EPA") is an

agency in the executive branch of the United States government responsible for enforcing

-2-

federal laws and regulations concerning the protection of the public and the environment, including the Clean Water Act and the Resource Conservation and Recovery Act ("RCRA").

2.      The U.S. EPA delegated to the State of Ohio, through the Ohio Environmental Protection Agency ("Ohio EPA"), authority to approve pretreatment programs in the State of Ohio.  The Northeast Ohio Regional Sewer District's ("NEORSD") pretreatment program was approved by the Ohio EPA.  The NEORSD pretreatment program provided for the issuance of permits to industrial users of the sewer system such as GENERAL ENVIRONMENTAL MANAGEMENT, LLC ("GEM").

3.      SCOTT A. FORSTER, was the Vice President and a part owner of GEM, an Ohio corporation.  GEM was an industrial wastewater treatment facility located in Cleveland, Ohio.

4.      Industrial wastewater received by GEM was processed through GEM's wastewater treatment system to reduce the level of pollutants in the wastewater.  After being processed, the industrial wastewater was discharged to the sewer system.

5.      GEM discharged the treated industrial wastewater into the NEORSD sewer system which serviced the City of Cleveland.  NEORSD issued a permit to GEM allowing GEM to discharge wastewater to the sewer system pursuant to certain limitations and conditions.  GEM's permit provided that all wastewater received for

-3-

processing by GEM must be pre-approved by NEORSD. Acceptance by NEORSD was based, in part, on analysis of the industrial wastewater.

6.      Between August 23, 2004, and August 25, 2004, GEM received approximately 16,000 gallons of non-hazardous wastewater from an industrial facility in Columbus, Ohio. GEM had not been pre-approved to process this particular industrial wastewater from the Columbus facility.

7.      After learning that GEM had accepted industrial wastewater from the facility in Columbus, a representative from NEORSD contacted GEM concerning the disposition of that industrial wastewater. In particular, the NEORSD representative asked whether GEM had processed the industrial wastewater from the Columbus facility.

8.      In response, on or about December 8, 2004, SCOTT A. FORSTER mailed a ten-page response to NEORSD. In the cover letter, SCOTT A. FORSTER stated that the industrial wastewater never entered GEM's processing system and that the industrial wastewater was solidified and shipped to a landfill. Included in the ten pages of documentation were records showing the disposal of solidified material at a landfill.

9.      The industrial wastewater received from the Columbus facility was not solidified by GEM and shipped to a landfill. In fact, the wastewater was processed by GEM and discharged into the NEORSD sewer system.

-4-

10.     On or about December 8, 2004, in the Northern District of Ohio, Eastern

Division, defendants SCOTT A. FORSTER and GENERAL ENVIRONMENTAL

MANAGEMENT, LLC, in a matter within the jurisdiction of U.S. EPA, an agency in the

executive branch of the United States government, did knowingly and willfully make a

false, fraudulent, and fictitious material statement and representation, in that defendants

SCOTT A. FORSTER on behalf of GEM, stated to NEORSD that unapproved industrial

wastewater was not processed by GEM and not discharged into the NEORSD sewer

system, when in fact defendants SCOTT A. FORSTER and GENERAL

ENVIRONMENTAL MANAGEMENT, LLC, knew that GEM had processed the

unapproved wastewater and discharged it into the NEORSD sewer system.

All in violation of Title 18, United States Code, Section 1001 and Section 2.

The United States Attorney further charges:

## COUNT 2

11.     The allegations of paragraphs 1 through 9 of Count 1 above are

incorporated herein.

12.     RCRA, and the regulations promulgated thereunder, is a "cradle-to-grave"

program which prohibits the storage of hazardous waste without a permit.

13.     In addition to accepting hazardous wastewater transported in tanker trucks,

GEM also accepted drums of hazardous waste for processing.

-5-

14.     GEM did not have a RCRA permit to store hazardous waste at its facility in Cleveland. Because GEM did not have a RCRA storage permit, it was illegal for GEM to store hazardous waste, for any amount of time, at its facility in Cleveland. Therefore, the contents of any drummed hazardous waste accepted by GEM should have been pumped immediately into GEM's processing equipment after receiving the drums.

15.     The drums of hazardous waste accepted by GEM were accompanied by a hazardous waste manifest. A hazardous waste manifest is a three-part form with sections to be completed by the generator, transporter, and disposer of the hazardous waste. The hazardous waste manifest provides regulators the ability to track hazardous waste from cradle to grave.

16.     The generator of the hazardous waste signs the manifest and provides it to the transporter. Upon delivering the hazardous waste to the location designated on the manifest, the transporter signs the manifest. The manifest also includes a section to be completed by a second transporter, if applicable. If the hazardous waste is transported by a second transporter, this portion of the form is to be completed by the second transporter.

17.     Beginning in or about 2002, GEM began storing drums of hazardous waste at its facility. The drums were stored in a trailer. If there were more drums than would fit in the trailer, GEM stored the drums near the trailer where they were exposed to the

-6-

elements.  The drums were stored at the GEM facility awaiting processing at GEM or
shipment to a licensed disposal facility.

18.     Often when the drums were stored by GEM, a GEM employee would
complete the second transporter section of the manifest that accompanied the drums of
hazardous waste.  The GEM employee would sign the second transporter section of the
manifest as the agent for an unrelated RCRA transportation company.  The unrelated
RCRA transportation company did not authorize GEM to sign on its behalf.  The drums,
in fact, were not transported anywhere.  Instead the drums were being stored at the GEM
facility.  The manifests completed by GEM provided the false appearance that the drums
were in transport rather than being stored at the GEM facility.

19.     The practice summarized in paragraph 18 ended on or about July 31, 2005.

20.     From on or about January 1, 2002, and continuing through on or about July
31, 2005, on numerous occasions, in the Northern District of Ohio, Eastern Division,
defendant  GENERAL ENVIRONMENTAL MANAGEMENT, LLC, in a matter within
the jurisdiction of U.S. EPA, an agency in the executive branch of the United States
government, did knowingly and willfully make a false, fraudulent, and fictitious material
statement and representation, in that employees of defendant GEM completed the second
transporter portion of hazardous waste manifests to indicate that the drums of hazardous

-7-

were in transit, when in fact the drums of hazardous waste were not in transit, but actually were being stored at GEM's facility in Cleveland, Ohio.

All in violation of Title 18, United States Code, Section 1001 and Section 2.

The United States Attorney further charges:

<u>COUNT 3</u>

21.    The allegations of paragraphs 1 through 9 of Count 1 and 11 through 19 of Count 2 above are incorporated herein.

22.    To limit the amount of pollutants discharged into the sewer system, GEM used a variety of processes to reduce the concentration of pollutants in the wastewater discharged to the NEORSD sewer system.  In fact, GEM's permit with NEORSD limited the concentration of total solvents discharged to the sewer system, including methyl ethyl ketone ("MEK"), which is a toxic substance.

23.    The limit for total solvents in GEM's permit was 250 milligrams per liter ("mg/l").  GEM's permit provided that wastewater with a concentration of total solvents above 250 mg/l could not be discharged to the NEORSD sewer system.  The limit for total solvents was an instantaneous limit, and not based on a weekly or monthly average.

24.    GEM's permit also provided that "[i]f the results of GEM treated effluent analysis indicates that the treated batch is non-compliant . . . then GEM must return all

-8-

wastewaters not within limitations to the wastewater treatment system for necessary pretreatment prior to discharge."

25.     By permit, GEM was required to submit monthly operating reports ("MORs") to NEORSD.  The MORs contained the analytical results for each batch of wastewater discharged to the NEORSD sewer system.  The analytical results were compared to GEM's permit limits to determine if GEM's discharge was in compliance.

26.     Beginning on or about January 1, 2004, GEM employees began to discharge non-compliant batches of wastewater into the NEORSD sewer system.  Instead of returning the non-compliant batches to the head of the plant for reprocessing as required by GEM's permit, GEM employees discharged non-compliant batches to the sewer system simultaneously with a compliant batch.  The purpose of this practice was to dilute the non-complaint batch to an acceptable concentration.

27.     GEM employees discharged non-complaint wastewater batches into the NEORSD sewer system on approximately a weekly basis.

28.     After the batches were discharged, a GEM employee completed the MOR to be submitted to NEORSD.  Instead of reporting the actual test results for the non-compliant batch, the test results reported for the non-compliant batch were lowered on the MOR and reported to NEORSD.  The results reported for the non-compliant and compliant batches was the average of the two batches.

-9-

29.    From on or about January 1, 2004, and continuing through on or about March 31, 2005, on numerous occasions, in the Northern District of Ohio, Eastern Division, defendant  GENERAL ENVIRONMENTAL MANAGEMENT, LLC, being a person authorized by a law of the United States to make or give a certificate or other writing, knowingly made and delivered as true such a certificate or writing, containing statements which GEM knew to be false, in that employees of defendant GEM completed MORs that were submitted to NEORSD showing that batches of wastewater discharged to the sewer system were in compliance with GEM's total solvent permit limit, when these batches were above the GEM permit limit for total solvent.

All in violation of Title 18, United States Code, Section 1018 and Section 2.


*William J Edwards*
_____
WILLIAM J. EDWARDS
UNITED STATES ATTORNEY